Opinion issued December 30, 2010



In The

Court of
Appeals

For The

First District
of Texas

————————————

NOS. 01-08-00937-CR

          01-08-00938-CR

———————————

Shanell Monique Mosley, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 248th District Court

Harris County, Texas



Trial Court Case Nos. 1182323 & 1182322

 



 

OPINION ON PETITION FOR
DISCRETIONARY REVIEW

In light of the petition for discretionary review
filed by appellant, we withdraw our previous opinion of August 31, 2010.  Our judgment of the same date remains
unchanged.  See Tex. R. App. P.
50.  We substitute the following opinion
in its stead.

Appellant Shanell Monique Mosley was convicted of
abandoning two children.  See Tex.
Penal Code Ann. § 22.041(a),
(b), (d)(1) (Vernon Supp. 2009). 
The trial court assessed punishment in each of the two cases at two
years in state jail, suspended, and placed Mosley on community supervision for
five years.[1]  See Tex. Penal Code Ann. § 12.35(a) (Vernon Supp. 2009) (state‑jail
felony); Tex. Code Crim. Proc. Ann. art. 42.12, § 15 (Vernon Supp. 2009) (community
supervision).

Mosley brings five points of error, claiming the
evidence is legally and factually insufficient to prove Mosley intended to
abandon the children, the evidence is legally and factually insufficient to
prove Mosley left the children under circumstances that exposed them to an
unreasonable risk of harm, and the trial court erred in the admission of
evidence.  We affirm.

Background

          We begin
our analysis by summarizing testimony and evidence adduced at trial relevant to the issue of whether Shanell
Mosley abandoned her children under
circumstances that exposed them to an unreasonable risk of harm.[2]

A.    Mosley’s family and marriage plans

Mosley and her extended family are originally from
Louisiana.  While living there, Mosley
met her future husband, George Anichukwu, who was from the Republic of Benin, a
country in western Africa.  They
established a long‑distance relationship, communicating by telephone
after Anichukwu returned to Benin.

After Hurricane Katrina, Mosely and her children
moved to Texas.  Anichukwu subsequently
asked Mosley to marry him.  Because
Anichukwu was not a United States citizen, an immigration lawyer advised the
couple to marry in Africa so he could obtain a spousal visa.  Mosley planned to leave Houston on December
31, 2007 to visit Africa for six weeks, get married in Nigeria, and help
Anichukwu open a nonprofit organization for children.

B.    Mosley’s child-care plans during her trip to
Africa

At the time of Mosley’s trip to Africa, she had six
children, whose ages were as follows: J.R., a one‑year‑old male;
Z.M., a seven‑year‑old male; AA.M., an eight‑year‑old
female; AN.M., a nine‑year‑old male; E.M., a fifteen‑year‑old
female; and T.M., a sixteen‑year‑old female.  Mosley did not want to take one‑year‑old
J.R. to Africa because she was planned to stay in a house with no electricity
or running water, and she was concerned he might get sick.  She also said she could not afford to bring
any of her other children with her on the trip.

Mosley testified that her close family members were
involved in preparing for the wedding and the planning to take care of her
children.  Her primary child care plan
was for the children to be supervised during the entirety of her six-week
absence by her sister Shaqual Mosley, who was to come to Houston from
Louisiana.  Shaqual testified that Mosley
asked her about six months in advance to look after the children during the
anticipated trip to Africa.  Mosley’s
backup plan was for the children to be cared for by her friend Shawn Harrison,
for whom she was a regular babysitter.

Mosley said she left $2,000 for Shaqual to take care
of the children, as well as medicine and medical records.  She also left emergency telephone numbers,
both written and stored in the home phone and in her mobile phone.  She testified that she left food in the house
and that before she left, she cooked food for Shaqual to feed the
children.  She also gave the keys to her
van to her fifteen-year-old daughter E.M., along with between $100 and $200 for
food and some credit or debit cards.[3]

Mosley originally expected Shaqual to arrive in Houston
on December 29 by getting a ride with a friend. 
Shaqual testified that she was planning to travel by bus on that day,
but did not because bus fares were higher than she expected during the holiday
season.  Mosley offered to send money to
Shaqual, but she declined, saying she was going to get the money from a
brother.  Although she knew Shaqual could
not come to Houston on December 29, Mosley said she did not change her plans at
that time because her $1,600 plane ticket was nonrefundable.

Mosley thought that Shaqual would be arriving on the
bus on December 30, and she asked Harrison to meet her at the bus
station.  But Shaqual did not arrive that
day either.

The next plan was for Shaqual to arrive in Houston
on December 31—the same day as Mosley’s scheduled trip to Africa on a flight
departing at 4:40 p.m.  Shaqual
called Mosley at 6:03 a.m. to say that she was catching an 8:00 a.m. bus that
would arrive in Houston at 2:00 p.m.  But
that was not true.  Shaqual had been
unable to get bus money from her brother, and instead of so informing Mosley,
she told her to go ahead with her travel plans because she had promised to not
let her down.

Shaqual also called their cousin, Diana Jackson, who
lived in the Houston area.  Shaqual
testified that she asked Jackson to take care of Mosley’s children, but that
Jackson was uncomfortable with taking that responsibility.  Shaqual then talked to E.M. and told her to
stay inside the house with the other children. 
Shaqual told E.M. that if Mosley called the house, “Don’t tell her I’m
not there because I didn’t want her to freak out or panic.”

Meanwhile, Mosley did not realize until that day
that she needed to be at the airport before Shaqual’s 2:00 p.m.
arrival.  When she realized the problem,
she again asked Harrison to pick up Shaqual. 
He took Mosley to the airport and left his own two young children to be
watched by Mosley’s older children.

Shaqual said that she and Mosley spoke with each
other more than twenty times on December 31 and that Mosley told her that she
needed to be on the bus before Mosley boarded her plane.  Mosley testified that she talked to Shaqual
on the phone before she left for the airport, and she was confident that
Shaqual was on her way to Houston. 
Shaqual testified that in their last conversation that day, when Mosley
was at the airport, she told her that she was on the bus and three hours away
from Houston.  E.M. testified that she
also spoke with Mosley on the phone before her plane left, and told her that “Shaqual
was almost here.”  This was not true,
however, as Shaqual never left her house. 
Shaqual said that she told Mosley she was on her way because she did not
want her to worry. 

Mosley admitted that she left on her flight to
Africa without knowing whether Shaqual had in fact arrived to take care of the
children.  She planned to call and check
on Shaqual once she landed in Africa on January 1.

C.   Events following Mosley’s departure

a.     December 31

In Shaqual’s absence, fifteen-year-old E.M. was
looking after her four younger siblings, as well as Harrison’s two young
children, while her mother was being taken to the airport.  E.M. had the credit or debit cards that had
been left by her mother, but she was unable to use them to withdraw money
because she did not know how to use them. 
E.M. testified that she felt very overwhelmed by having to be
responsible for all the children.  Turner
stated that she saw E.M. unsuccessfully attempt to withdraw money using a debit
card so she could buy groceries.

At this time E.M. was on probation for assault, and
her juvenile‑court advocate was S. Turner.[4]  Sometime around noon that day, E.M. had
called Turner and told her that Shaqual had not yet arrived.  Turner went to the house around 3:45 p.m. and
found E.M. outside in the van, holding the car keys.  E.M. told Turner that she was only charging
her phone and promised she would not drive the van.

Nevertheless, later that evening E.M. drove the van
around the block with a friend, and upon their return drove the van into the family’s
garage.  E.M. called Harrison and told
him that “somebody pushed the car into the garage.”  Harrison then came over to the house for
about two hours to look at the garage. 
An ambulance came, which E.M. said was requested by her friend.  The ambulance personnel examined E.M. and
found that she was not hurt.

E.M. called Turner around 7:00 p.m. and in a
hysterical voice and said that she had run the van into the garage.  Turner came to the house around 8:30 p.m. and
found E.M. screaming, “I’m going to run away. 
My mom is going to kill me.” 
Turner told E.M. to call her grandmother in New Orleans and her aunt
Diana Jackson in Houston.  E.M. called
Shaqual and Jackson and told each of them about the accident.  Shaqual called Jackson again and encouraged
her to hurry up in getting to Mosley’s house.[5]

That night Mosley’s oldest daughter, sixteen-year-old
T.M., came to the house with her friend Joyce and Joyce’s sister.  During this time period, T.M. had not been
living in the house, but she came to the house after Mosley’s departure.  She had been told by E.M. that Shaqual was at
the house.  T.M. saw the damage to the
garage door and found that Shaqual was not at the house.  At trial, T.M. did not explain why she did
not stay at the house that night after finding out that Shaqual was not
there.  After Harrison left the house,
Jackson and her children came over and spent the night.

b.    
January 1

In the morning, Jackson left, T.M. returned, and
E.M. called Shaqual in surprise that she had not arrived.  E.M. testified that a friend of hers came
over to the house and burned some food in a pot.  She said there was plenty of food in the
house, except there was no milk for the children’s breakfast.

E.M. called Harrison, who came over and took her to
the store to shop, along with three of the other children.  They left one-year-old J.R. at home with
T.M.’s friend Joyce.  E.M. bought food
with the money given to her by Mosley. 
Harrison never came in the house, and E.M. told him that Shaqual was
there.

At some point during the day, E.M. drove everyone in
Mosley’s van to McDonald’s to eat.  T.M.
testified that she knew that E.M. was not supposed to drive Mosley’s van and
that the children looked like they were in good health.

Turner spoke to E.M. around 10:00 a.m. and found out
that neither Jackson nor Shaqual was at the house.  Later that morning, E.M. drove the van again
to take Joyce to work.  She later drove
AA.M. and AN.M. to a party in the neighborhood. 
That afternoon, between five to ten of E.M.’s friends came over to the
house.  The age of her friends ranged
from sixteen to nineteen, and E.M. admitted that Mosley would not have allowed
that many children to be in the house.

When Shaqual did not show up at the house by the
evening of January 1, E.M. was upset and called her.  She again drove the van to pick up Joyce, and
T.M. and Joyce spent the night at the house.

Mosley called home upon her arrival in Africa and
quickly spoke to one of her children. 
She assumed that Shaqual was in Houston, but Mosley testified that she
did not ask to speak to her.  Shaqual,
however, testified that she told Mosley on January 1 that she had never arrived
at the house.  Shaqual said that Mosley
was “mad” during that call.  She told
Mosley not to worry and that she had called a cousin of theirs who was with the
children.  Shaqual later admitted that
her telephone records did not show any calls between Mosley and her on January
1, 2008.  There was one international
call to Africa on January 2 when Shaqual spoke to Mosley.

c.     
January 2

T.M. left the house around 3:00 a.m. on January
2.  She expected Shaqual to arrive on the
bus later that day.  In the morning, E.M.
drove Joyce to work before the other children woke up.  She then drove the children to McDonald’s
after picking up Joyce, who was on a break. 
Sometime during the day, Harrison dropped his children off at the house
before he went to work.  That afternoon,
E.M. called Mosley using a calling card and told her, falsely, that Shaqual was
at the house.  Mosley asked to speak with
the other children, and E.M. told her that they were at the store with Shaqual.

Late that afternoon, E.M. drove the van to give
Joyce a ride from work, while the other children were at home with T.M.  E.M. hit a car while she was driving to get
Joyce.  E.M. called Shaqual, Jackson, and
Harrison about this incident.  After E.M.
dropped Joyce off, she drove home to find that law‑enforcement officers
were there.  She initially testified that
she called Mosley in Africa to tell her what had happened, but later denied this
and said that she lied about it.

D.   The January 2 “welfare check”

          Deputy A. Ortiz of the Harris County
Sheriff’s Department testified that she was sent to Mosley’s house on January 2
at 7:30 p.m. for a “welfare check,” which is an inquiry by law‑enforcement
personnel regarding a person’s well being, such as an elderly or suicidal
person.  In this instance, the sheriff’s
department received a call from someone who believed that Mosley’s children had
been left alone.  When she was
dispatched, she was told the children were alone in the house and the mother
had gone to Africa to get married.

Ortiz knocked on the front door and identified
herself as a sheriff’s deputy, but no one answered.  She saw a silhouette of a child’s head in an
upstairs window, and she contacted Sergeant G. Rogers of the Harris County
Sheriff’s Department and continued to knock on the door and identify
herself.  After some time passed, T.M.
opened the door, talking on a cell phone and apparently upset at Ortiz’s
presence.[6]  Without stopping her phone conversation, T.M.
allowed Ortiz to enter the house.

Ortiz gathered together all of the children as
Rogers arrived.  There were seven
children in the house: all of Mosley’s children except E.M., plus Harrison’s
two children.  Rogers testified that the
children’s demeanor was fine, but they were all hungry.

Ortiz talked to the children and became concerned
about one-year-old J.R., who she was not able to wake.  Rogers was also concerned about J.R., who he
described as listless and apparently dehydrated.  Ortiz believed J.R. was not merely sleepy, so
she asked that Emergency Medical Services come to the scene and examine him.  She also asked another deputy to go buy food
for the children, because it appeared to her they had not eaten since that
morning.  Rogers testified, “All the children were hungry.  Every one of them were starving.”  When
EMS personnel arrived, they gave Pedialyte to J.R., but he did not need
intravenous fluids or hospitalization. 
EMS personnel examined all of the children, but did not take them to the
hospital.

          Rogers saw soot in the kitchen,
indicating to him there had been a stovetop fire.  He saw flour or baking soda on the stove,
which he believed the children used to put out the fire.  Based on his prior experience as a
firefighter, Rogers estimated that the fire occurred from three days to a week
before.  He later admitted it was
possible that Mosley had caused the fire before she left.[7]

          While the other children were eating,
E.M. arrived.  E.M. appeared very upset
and bothered that the deputies were at the house.  Ortiz was eventually able to find out from
E.M. that Mosley was in Africa.  Ortiz asked
both E.M. and T.M. if there were any adults that could be called to come over
and stay with the children, but were told there was no one who lived
locally.  Most of the children’s
relatives lived in Louisiana.  None of
the children mentioned Diana Jackson or Sandra Turner as an adult who could be
contacted.

          Ortiz admitted that he did not check
the children for injuries or bruises. 
Other than J.R.’s condition, Ortiz did not see anything that alarmed her
about the children’s physical condition. 
She determined that T.M. was speaking on the phone to her aunt, Diana
Jackson, but she did not ask to speak to Jackson.  She also did not ask E.M. if there were any
adults who were supposed to be with the children while Mosley was gone.  Ortiz made no attempt to contact either
Mosley or Jackson, and she was the officer who contacted the district
attorney’s office to ask for charges to be brought against Mosley.

T.M. told Ortiz that she was staying with a friend
because Mosley had kicked her out of the house three or four weeks earlier—something that Mosley denied at trial.  E.M. told Ortiz that she was the person
taking care of the younger children.

Rogers did not see a list of emergency-contact
numbers left anywhere in the house, and he found only one working telephone.  Rogers admitted that he did not check to see
if emergency-contact numbers were stored on the telephone.  He did not find any money, debit cards, or
any checks, but admitted that he did not ask the children if Mosley had left
any money.

Harrison arrived at the house while the deputies
were there.  He told Rogers that he
believed that Mosley had gone to Africa, but was not sure.

Around 11:30 p.m. an investigator for the Department
of Family and Protective Services was called to go to Mosley’s house and assist
in transporting the children to the Child Protective Services office.  Investigator P. Smith testified that the
primary reason for taking the children into custody was because no adult was
present.  Smith took both the Mosley
children and the Harrison children into CPS custody.  She acknowledged that Harrison was present
when she arrived.

Smith said that when she saw the children on January
2, they were dressed appropriately.  She
saw food in the house that the children could eat, such as canned goods, peanut
butter, and food in the refrigerator. 
The only thing she did not see was milk in the refrigerator for
J.R.  She did not remember whether there
was any canned milk in the pantry.  Smith
did not have a negative opinion about J.R.’s appearance or general health.  She worked at the CPS office until
approximately 4:00 or 5:00 a.m. to prepare required reports.  During that time, no one came to pick up
Mosley’s children.

Sixteen-year-old T.M. later ran away from the CPS
facility and called Mosley.  She
explained to her mother that Shaqual had never arrived, “everybody thought she
had abandoned us,” the children were in CPS custody, and Mosley “was in
trouble” and needed to “get here as fast as you can.”[8]

E.    Mosley’s response to learning about the CPS intervention


          Shaqual testified that she told Mosley
on January 3 that law enforcement had come out to her house and her children
had been placed in CPS custody.  Mosley,
however, testified that she first learned her children were in CPS custody on
January 6, when she received a call from T.M. after she had run away from
CPS.  

Mosley and her husband collected money from
villagers to raise the approximately $200 needed to change the date of her
February 16 return flight and return early to Houston.  It took her approximately twelve days to find
the money.  She called family members in
the United States and asked them to send her money, but no one would.  Due to a late bus, Mosley missed the first
flight home she rescheduled for January 17. 
The next flight she was able to schedule was on January 27.  No one from law enforcement or CPS contacted
her while she was in Africa, but Mosley called CPS and was told she would be
arrested when she returned.  Mosley
testified that she was surprised Shaqual never arrived to take care of the
children and that she would not have left for Africa if she had known that
Shaqual was not coming.

F.    Harrison’s January 4 telephone call

A. Samuy, a CPS investigator employed by the
Department of Family and Protective Services, was assigned to investigate the
Harrison children.  While she was at
Harrison’s house on January 4, she observed him receiving an international
phone call.  She testified that she saw the
caller’s thirteen-digit phone number, which began with “234.” 
Harrison put the call on speakerphone, and Samuy heard the caller say
she was “Monique,” who Samuy said she recognized as Mosley.  Samuy heard Mosley tell Harrison, “Do not
talk to CPS,” and “you know Shaqual was supposed to watch them children
[because] you was supposed to pick her up from the bus station.”  Samuy also heard Mosley tell Harrison that
she had left money for Shaqual’s bus fare and to take care of the children
while she was gone.  The conversation
lasted about five minutes, then the connection was lost.

Samuy testified that Harrison then told her he was
calling Shaqual, and Harrison dialed a number and put the phone on
speaker.  Samuy heard a voice say, “This
is Shaqual.”  Samuy testified that
Shaqual went on to say the following:

Monique knew I wasn’t coming
to Houston before she got on the plane because she didn’t send me any
money.  She didn’t send the bus money for
me and my kids to come.  She knew before
she got on that plane that I wasn’t going to be—I couldn’t come to
Houston.  I don’t know why she got on
that plane.

 

Samuy
admitted she did not know if Shaqual was being truthful, or if she was lying to
cover up for lying to Mosley.  Samuy
believed that Harrison let her listen to the calls to demonstrate that he acted
reasonably when he left Mosley’s house on December 31, assuming that his
children were being adequately supervised by Shaqual.  Finally, Samuy admitted on cross‑examination
that both calls referred to a “Monique” and that she did not have any
independent knowledge that Mosley went by the name “Monique.”

The State asked Shaqual if she told Harrison on
January 4 that “my sister knew I couldn’t come because she did not send
money.  She knew I had not left.  She was supposed to wire me money and she
didn’t.”  Shaqual responded, “I don’t
remember ever saying that.”

G.   Shaqual’s statement to Cara Bates

          Cara Bates, a court appointed special
advocate with Child Advocates, testified that she spoke with Shaqual in New
Orleans on May 25, 2008 as part of the process of assessing relatives for
placement of Mosley’s children.  Bates
asked Shaqual what happened on December 31, and Shaqual told her she had been
sent money for a bus ticket, but because the fares had increased for the
holidays, the ticket was too expensive. 
Shaqual said that she called Mosley before she boarded her plane and
told her that “she could not afford the bus ticket but would find some way over
to Houston.  But wasn’t on her way
yet.”  The conversation continued with
Shaqual telling Mosley she tried to get a friend to drive her to Houston, but
it did not work out and “she had no way to get to Houston.”

          Bates admitted that she relied solely
on Shaqual’s statements to her and that she had not seen any phone
records.  She said that Shaqual appeared
to feel guilty that she was unable to get to Houston.  Shaqual told her that Mosley never offered
her any additional money for the bus.

Analysis

I.                 
Admission
of evidence

In her
fifth point of error, Mosley contends the trial court erred in overruling her
authentication objection to Samuy’s
testimony about a telephone conversation she heard on a speakerphone while she
was at Harrison’s house.  This testimony
was offered by the State to rebut Shaqual’s prior testimony that she did not
remember telling Harrison that Mosley knew Shaqual was not coming to Houston on
December 31.

Samuy testified that Harrison dialed a number, put
the call on speakerphone, and a person answered saying, “This is Shaqual.”  Mosley then specifically objected as follows,
“Objection, Your Honor, unless she [Samuy] can authenticate Shaqual’s voice I
would object to her testifying to someone she doesn’t know.”  The trial court immediately overruled the
objection.  Samuy then testified that the
person on the phone said the following:

Monique knew I wasn’t coming
to Houston before she got on the plane because she didn’t send me any
money.  She didn’t send the bus money for
me and my kids to come.  She knew before
she got on that plane that I wasn’t going to be – I couldn’t come to
Houston.  I don’t know why she got on
that plane.

 

Texas Rule of Evidence 901 provides for the
authentication of telephone calls as follows:

(a)  General
Provision.  The requirement of authentication or
identification as a condition precedent to admissibility is satisfied by
evidence sufficient to support a finding that the matter in question is what
its proponent claims.

 

(b) 
Illustrations.  By way of illustration only, and
not by way of limitation, the following are examples of authentication or
identification conforming with the requirements of this rule:

 

. . . .

 

(6)  Telephone
conversations.  Telephone
conversations, by evidence that a call was made to the number assigned at the
time by the telephone company to a particular person or business, if:

 

(A)  in the case of a person, circumstances,
including self-identification, show the person answering to be the one called;
or

 

(B)  in the case of a business, the call was made
to a place of business and the conversation related to business reasonably
transacted over the telephone.

 

. . . .

 

Here, the State offered testimony (1) of the number called
and (2) that the person who answered identified herself as Shaqual.  At trial, Mosley did not make a specific Rule
901 objection on the basis that the phone number offered by the State was not
assigned to Shaqual.  Instead, Mosley
made an objection that Samuy was not
able to authenticate Shaqual’s voice.

While the State did not match all
the elements of the illustration in Rule 901(b)(6)(A), Rule 901(b)
specifically provides that the illustrations do not limit the general provision
in Rule 901(a): “The requirement of authentication or identification as a
condition precedent to admissibility is satisfied by evidence sufficient to
support a finding that the matter in question is what its proponent claims.”  Although the State did not show that the call
“was made to the number assigned at the time by the telephone company to a
particular person,” that alone does not foreclose authentication on other
grounds.

Alternate grounds to authenticate
the identity of a telephone caller include self-identification of the caller
coupled with additional evidence such as the context and timing of the
telephone call, the contents of the statement challenged, internal patterns and
other distinctive characteristics, and disclosure of knowledge and facts known
peculiarly to the caller.  See, e.g., Manemann v. State, 878 S.W.2d 334, 338 (Tex. App.—Austin 1994, pet.
ref’d) (citing United States v. Orozco‑Santillan,
903 F.2d 1262, 1266 (9th Cir. 1990); United
States v. Miller, 771 F.2d 1219, 1234 (9th Cir. 1985); and Tex. R. Crim.
Evid. 901(b)(4), (5), (6), 11 Tex. Reg. 565 (Tex. Crim. App. 1985) (former
Texas Rule of Criminal Evidence 901, since repealed by current Texas Rules of
Evidence)).  Here, Samuy testified that
the person on the phone identified herself as Shaqual and continued to disclose
information that was very specific to circumstances previously described by
Shaqual and Mosley.

We hold that the trial court did not abuse its
discretion in admitting Samuy’s testimony because there was sufficient evidence
before the trial court to support a finding that person on the telephone was
Shaqual.  See Tex. R. Evid.
901(a); see also Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)
(discussing abuse-of-discretion standard in review of evidentiary rulings); Montgomery v. State, 810 S.W.2d 372, 378–80
(Tex. Crim. App. 1990) (same).  The trial
court’s ruling that the evidence was admissible, of course, did not preclude
Mosley from challenging its weight and credibility.

We
overrule the fifth point of error.

II.              
Sufficiency
of the evidence

          In her first four points of error,
Mosley contends the evidence is legally and factually insufficient to establish
that she intended to abandon the children
and that she left the children under circumstances that exposed them to an
unreasonable risk of harm.  Mosley
grouped these arguments together and did not make separate arguments for her legal
and factual sufficiency points.

Penal Code section 22.041 provides in part:

(a)  In this section, “abandon”
means to leave a child in any place without providing reasonable and necessary
care for the child, under circumstances under which no reasonable, similarly
situated adult would leave a child of that age and ability.

 

          (b) 
A person commits an offense if, having custody, care, or control of a
child younger than 15 years, he intentionally abandons the child in any place
under circumstances that expose the child to an unreasonable risk of harm.

 

Tex. Penal Code Ann. § 22.041(a), (b) (Vernon
Supp. 2009).  When an appellate
court decides a case without issuing a majority opinion providing a single
rationale explaining the result, the majority holding is the position taken by
those members who concurred in the judgment on the narrowest grounds.  Haynes
v. State, 273 S.W.3d 183, 186 (Tex. Crim. App. 2008).  A majority of the Court of Criminal Appeals
has interpreted section 22.041 to mean that the prescribed mental state—intentional—is connected with the act of abandonment. 
See Schultz v. State, 923 S.W.2d 1, 2–4 (Tex. Crim. App. 1996)
(plurality op.); id. at 4–5 (Maloney
& Mansfield, JJ., concurring).  To
meet this culpable mental state, the defendant must intentionally leave a child
in any place without providing reasonable and necessary care for the
child.  Tex.
Penal Code Ann. § 22.041(a); Schultz, 923 S.W.2d at 2–4 (plurality
op.); id. at 4–5 (Maloney &
Mansfield, JJ., concurring).  Additionally,
the defendant must know that the circumstances are such that no reasonable,
similarly situated adult would leave a child of that age and ability.  Tex.
Penal Code Ann. § 22.041(a); Schultz, 923 S.W.2d at 2–4 (plurality
op.), 4–5 (Maloney & Mansfield, JJ., concurring).  However, the evidence need not show that the
defendant actually knew that the circumstances would expose the child to an
unreasonable risk of harm.  See Schultz,
923 S.W.2d at 2–4 & n.6 (plurality op.), 4–5 (Maloney & Mansfield, JJ.,
concurring).  As noted by the Schultz plurality, “[t]his construction appears designed to
punish actors who are aware of the dangerous circumstances even though, due to
shortsightedness, lack of common sense, apathy, or just plain stupidity, they
may not be aware that the circumstances are dangerous.”  Schultz, 923 S.W.2d at 4 n.6 (plurality op.).

The standard of review for sufficiency of the evidence is
whether, viewing the evidence in the light most favorable to the verdict, any
rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979); Brooks v. State, 323 S.W.3d 893, 902
(plurality op.), 926 (Cochran, J., concurring) (Tex. Crim. App. 2010).[9]  The jury is the exclusive judge of the facts.  Tex.
Crim. Proc. Code Ann. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979);
Brooks, 323 S.W.3d at 893, 908.  Accordingly, “[a]ppellate courts should
afford almost complete deference to a jury’s decision when that decision is
based upon an evaluation of credibility.” 
Lancon v. State, 253 S.W.3d
699, 705 (Tex. Crim. App. 2008).  “The
jury is in the best position to judge the credibility of a witness because it
is present to hear the testimony, as opposed to an appellate court who relies
on the cold record.”  Id.

a.    
Intent to
abandon

Mosley contends that the evidence
is insufficient to prove that she intended to abandon her
children.  As noted above, to “abandon” in this context means “to leave a child
in any place without providing reasonable and necessary care for the child,
under circumstances under which no reasonable, similarly situated adult would
leave a child of that age and ability.”  Tex. Penal Code Ann. § 22.041(a) (Vernon Supp. 2009). 
In this regard, Mosley suggests that reasonable adults routinely leave
their children supervised by a teenager. 
That common-sense notion cannot immunize Mosley’s conduct as a matter of
law.  Leaving four children under the age of ten for six weeks
without adult supervision and under the supervision of a fifteen‑year‑old
child who is on juvenile probation is an entirely different proposition than
hiring a babysitter for the evening. 
Many appellate cases have discussed the offense of abandoning a child,
and we consider three with analogous circumstances.  See Schultz v. State, 879 S.W.2d 377 (Tex. App.—Amarillo 1994), aff’d, 923 S.W.2d 1 (Tex. Crim. App. 1996); Castillo v. State, No. 08‑04‑00377‑CR, 2006
WL 1710062 (Tex. App.—El Paso June 22, 2006, no pet.) (not designated for
publication); Cochener v. State, No.
14‑91‑00153‑CR, 1992 WL 105768 (Tex. App.—Houston [14th Dist.]
May 21, 1992, no pet.) (not designated for publication).

          In Cochener
v. State, the defendant was convicted of abandoning her four‑year‑old
daughter when the defendant left the child unattended in a car while she went
shopping.  The defendant brought a legal‑sufficiency
challenge, claiming that the State “failed to refute her allegation that the
child was competent to supervise herself.” 
1992 WL 105768, at *2.  She also
contended that she did not abandon her four‑year‑old child because
she left the child in the care of her “capable twelve‑year‑old
son.”  Id.  The Fourteenth Court
rejected both of these arguments, stating, “The jury was entitled to believe
that a reasonable, similarly situated adult would not permit a twelve‑year‑old
to be solely responsible for the care of a younger sibling for any period of time without some parental
supervision.”  Id.

          In Schultz
v. State, the defendant was convicted of abandoning her nine‑year‑old
daughter when the defendant left her and an eleven‑year‑old nephew
at home from noon until 3:30 a.m. the next day. 
879 S.W.2d at 378.  The defendant
did call the children periodically on the phone, but tragically both the
daughter and nephew were killed in a fire while the defendant was gone.  See
id. at 378, 380–81.  The defendant argued on appeal that because
of her phone calls, the evidence was legally insufficient to show that she was
aware of, but consciously disregarded, a substantial, unjustifiable,
unreasonable risk of the children’s death by fire.  Id.
at 380.  The Court of Criminal Appeals explained that “abandoning” a child is not
the same as “leaving” a child:

Appellant mistakenly believes that this
interpretation of the statute punishes her actions without regard to the
surrounding circumstances.  On the
contrary, by intentionally “abandoning” a child, the actor does more than
merely intentionally “leave” the child. 
The actor intentionally leaves the child under a certain set of objectively unreasonable circumstances
outlined in the definition of “abandons.” 
This construction appears designed to punish actors who are aware of the
dangerous circumstances even though, due to shortsightedness, lack of common
sense, apathy, or just plain stupidity, they may not be aware that the
circumstances are dangerous.

 

Schultz, 923
S.W.2d at 4 n.6.

Finally, in Castillo v. State, the defendant left her six‑year‑old son, eight‑year‑old
son, and eleven‑year‑old daughter alone at home overnight beginning
at approximately 7:00 p.m.  2006 WL
1710062, at *2–3.  The defendant had an
adult friend who was staying at the house, but she was not able to talk to him
and tell him that she would not be coming home. 
Id. at *2.  There was conflicting evidence whether the
defendant left the children alone that night or with the roommate.  Id.
at *4.  The El Paso court held the
evidence of the defendant’s fourteen‑hour absence was legally and
factually sufficient to prove the
defendant left the three children without providing reasonable and necessary
care and that a reasonable and similarly situated adult would not have left the
children there overnight.  Id. at *4.

Viewed in the light most favorable to the verdicts, the
evidence shows that Mosley planned to be out of the country from December 31,
2007 to February 16, 2008.  Mosley’s plan for taking care of her children
while she was gone was for her sister Shaqual to come to Houston and stay with
the children.  The only evidence of a
backup plan if Shaqual did not arrive was Mosley’s statement that Harrison
would take care of the children “while [Shaqual] wasn’t there,” which the jury
was entitled to disbelieve.  See Margraves, 34 S.W.3d
at 919.  The record shows that Jackson did spend one
night at the house and that sixteen-year-old T.M. was present at times to
assist E.M.  The record, however, fails
to show that other than this intermittent assistance to E.M., there was any
plan for Jackson or T.M. to commit to caring for the four young children.  Mosley boarded her plane knowing that her
sister Shaqual had not arrived at the house to care for her children, and there
is evidence in the record that Shaqual told Mosley that she had no way to get
to Houston.  This left E.M., a teenager
on juvenile probation, with no adult supervision and in charge of the
complainants, one‑year‑old J.R. and eight‑year‑old
AA.M., as well as seven‑year‑old Z.M. and nine‑year‑old
AN.M.  On this record we conclude that a
rational trier of fact could have found beyond a reasonable doubt that Mosley intentionally
abandoned her children by leaving
them at home without providing for their reasonable and necessary care.  Additionally, the evidence is sufficient to
show that Mosley knew that the circumstances were such that no reasonable
similarly situated adult would leave children of the same age and ability.  See
Cochener, 1992 WL 105768, at *2.

b.   
Circumstances
of exposure to unreasonable risk of harm

Mosely also contends that the
evidence is insufficient to prove that she exposed her children to an
unreasonable risk of harm.  In Castillo, a
mother had left three children at home overnight, and the court held the evidence was legally and factually sufficient to prove the defendant abandoned the children under
circumstances that exposed them to an unreasonable risk of harm.  2006 WL 1710062, at *5.  Although nothing bad
happened, the court pointed out that any of the children could have been
injured or fallen ill during the defendant’s fourteen‑hour absence and
there was evidence that the children did not have adequate food available to
them.  Id. at *5.

In this case, Mosley argues that she arranged for Shaqual to
take care of the children and that she did not know Shaqual was not on her way
to Houston at the time Mosley boarded her plane.  Mosley points out that Jackson did come over
to stay with the children one night and Harrison was at the house when law‑enforcement
officers came to the house.  There is conflicting evidence in the record
concerning whether Mosley thought her sister Shaqual was on her way to Houston
to take care of the children.  There is
also conflicting evidence in the record as to whether Mosley left sufficient
money and food in the house to provide for the children while she was gone for
six weeks.  Mosley does not argue,
however, that Jackson, Harrison, or some other adult had committed to
supervising the children if Shaqual was not able to take care of them.

Viewed in the light most favorable to the verdicts, the
evidence in this case shows Mosley did
not leave sufficient money to provide for the children during her planned six‑week
absence.  Mosley testified she gave no
more than $2,000 in cash to E.M., and the evidence was inconsistent as to
whether even that much money had been left. 
E.M. said she had access to credit or debit cards, but that Mosley had
not left her instructions on how to use them. 
The evidence showed that E.M. had unsuccessfully attempted to obtain
cash with a debit card to buy groceries, which the jury could have concluded
was inconsistent with Mosley’s testimony that she had given her $2,000.

Finally, and again viewed in the light most favorable to
the verdicts, the evidence shows that although
food was in the pantry on January 2, it had not been served to the young
children who, at 7:30 p.m., apparently had not eaten since that morning when
the sheriff’s department found them at the house.  The one-year-old baby could not nourish
himself by taking food from the pantry; the food needed to be prepared and
served to him at regular intervals.  The
baby appeared listless and dehydrated. 
Based on this evidence, the jury could have concluded that the baby had
not been fed.  

          We
hold there is sufficient evidence from which the jury could find that Mosley abandoned the children under circumstances that
exposed them to an unreasonable risk of harm. 
As the Castillo court held in
similar circumstances, we also hold that because Mosley’s children could have
been injured or fallen ill during her absence and there was evidence that the
children did not have adequate food available to them, there is sufficient
evidence from which the
jury could find that Mosley abandoned them under circumstances that exposed them to an unreasonable risk of
harm.  See Castillo, 2006 WL 1710062, at *2–3.  

We overrule the first four points of
error.

Conclusion

          We affirm the trial court’s judgments.

 

 

 

 

                                                                   Michael
Massengale

                                                                   Justice

 

Panel
consists of Justices Jennings, Alcala, and Massengale.

Justice
Jennings concurring in the judgments.

Publish.  Tex.
R. App. P. 47.2(b).











[1]          The complainants were a one‑year‑old male, J.R. (trial court case number 1182323;
appellate case number 01‑08‑00937‑CR), and an eight‑year‑old
female, AA.M. (trial court case number 1182322; appellate case number 01‑08‑00938‑CR).

 





[2]          We note at the outset that a
substantial amount of evidence at trial and arguments in the appellate briefs
was directed to conflicting accounts related to the cleanliness of the Mosley
home.  Because this evidence has no
bearing on our resolution of this appeal, we exclude it from this summary.

 





[3]
          Mosley’s
sixteen-year-old daughter T.M. also
testified that Mosley had left $2,000 in cash, along with bank cards, hidden in
a closet and that E.M. knew where the cash and cards were.

 





[4]          Turner testified that she
had been aware for a couple of months that Mosley was going to Africa and that
Mosley had plans to care for her children while she was gone, but she did not
describe to the jury her understanding of Mosley’s plans.

 





[5]
          Although
inconsistent with the timeline of events as set forth above, Shaqual also
testified that she spoke with Mosley on
the phone on December 31 after E.M. crashed the van into the garage.

 





[6]          T.M. testified that the
first thing she did when she saw Ortiz was to call Shaqual and hide the
children in a room.  Shaqual testified
that this phone call was the first time she knew that the children were at the
house alone without Jackson.  Shaqual
told T.M. not to answer the door.

 





[7]          At trial, Mosley
discussed a cooking fire she had that left dark spots on the ceiling, but she
did not know what caused some other smoke damage in the kitchen.

 





[8]
          On cross‑examination, T.M. said that she first
called Mosley on January 12, ten days after she was taken into CPS
custody.  T.M. said that Mosley’s trip to
Africa was supposed to be for two or three weeks, not six weeks.  She also denied telling Ortiz that Mosley had
thrown her out of the house.

 





[9]
        Brooks was decided by the Court of
Criminal Appeals after our original opinion in this case issued, but before our
plenary power to revise the opinion expired. 
See Tex. R. App. P. 50. 
Our conclusion that the evidence was sufficient has not changed, and
Mosley does not suggest in her petition for discretionary review that Brooks should change our analysis.  However, in light of our decision to revise this opinion on other grounds, we
find it appropriate to also revise our analysis of the sufficiency of the
evidence to apply the Jackson v. Virginia standard to Mosley’s factual-sufficiency points.  See
Brooks, 323 S.W.3d at 902 (plurality op.) (“There is . . . no meaningful
distinction between the Jackson v.
Virginia legal-sufficiency standard and the Clewis [v. State, 922
S.W.2d 126 (Tex. Crim. App. 1996)] factual-sufficiency standard, and these two
standards have become indistinguishable.”), 915 (“If the evidence suffices to
prove guilt beyond a reasonable doubt, and it supports a rational, reasonable
verdict, as required under Jackson,
that evidence cannot logically be so lacking in probative value as to make the
jury’s verdict ‘manifestly unjust’ under the vague and subjective civil-law
factual-sufficiency standard.”) (Cochran, J., concurring).  See
generally Taylor v. State, 10 S.W.3d 673, 677–83 (Tex. Crim. App. 2000)
(discussing retroactive application of new rules).